**SO ORDERED.**

**SIGNED this 20 day of December, 2010.**



_Dale L. Somers_
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**For on-line use but not for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**HAYHOOK CATTLE COMPANY,**
**LLC,**

                **DEBTOR.**

**CASE NO. 10-41257**
**CHAPTER 12**

**MEMORANDUM OPINION AND ORDER ON THE AUTHORITY OF DEBTOR**
**TO FILE FOR RELIEF WITHOUT THE CONSENT OF**
**CARDONELL, OAKLEAF, AND SMITH CATTLE, INC.**

Tracey Cardonell ("Cardonell"), Coree Oakleaf ("Oakleaf") and Smith Cattle, Inc.,

("SCI") (hereafter collectively "Movants") have filed a motion to dismiss this Chapter 12

case filed by Hayhook Cattle Company, LLC ("Hayhook") on the grounds that Ran

Smith, a member of Hayhook, did not have the authority to place Hayhook in bankruptcy

without the consent of Movants. Colorado East Bank and Trust Company ("CEB"), a

creditor of Hayhook, supports the motion to dismiss. Debtor and Ran Smith oppose the

motion. For the reasons stated below, the Court finds, assuming that SCI was insolvent at the relevant time, that the objections of Movants and CEB to Hayhook's authority to file this chapter 12 bankruptcy case lack merit.

**BACKGROUND.**

This is a family dispute concerning the control of Debtor Hayhook, which is engaged in cattle backgrounding and feedlot operations. The spouses of Movants Cardonell and Oakleaf are sisters of Ran Smith. It is Ran Smith who asserts he had authority to file the voluntary petition on behalf of Hayhook. Prior to 1988, Ran Smith, Cardonell, and Oakleaf worked for SCI, a company originally formed by Don Smith, Ran Smith's father, and Don Smith's two brothers. In 1995, Don Smith and his brothers divided many of their business connections, and Ran Smith received the controlling interest in SCI. Hayhook was formed in 2001. Effective October 31, 2006, Ran Smith owned 90 units of Hayhook and SCI owned 10 units, and Cardonell, Oakleaf, and Ran Smith were the managers of Hayhook. As of May 10, 2010, it appears that Cardonell, Oakleaf, and Ran Smith were the directors of SCI.

For reasons which will be explained below, Ran Smith contends he was authorized to file the petition on behalf of Hayhook because SCI became insolvent. The parties have agreed by filed stipulation to reserve for future determination the question of SCI's solvency, and to submit to the Court for determination the issue of "Whether Hayhook

had the authority to file this chapter 12 bankruptcy case."[1]  After the filing of a joint

stipulation and briefs, the Court took the issue under advisement and is now ready to rule.

The Court rejects the Movants' and CEB's arguments.

**FINDINGS OF FACT.**

The findings of fact are based upon a stipulation and documents, the admissibility

of which the parties have jointly stipulated.  Debtor Hayhook Cattle Company, LLC, is a

Kansas limited liability company.  Hayhook's Articles of Organization (hereafter

"Articles") were filed with the Kansas Secretary of State on September 20, 2001.  The

Articles provide in part that the governing documents are (1) the Articles, (2) the

Operating Agreement, and (3) the Member Control Agreement, and that the "provisions

of the Operating Agreement shall be subordinate to the Articles of Organization and the

Member Control Agreement."  As to termination of members, the Articles state the

following in section 2.3:

> 2.3 <u>Termination of Members.</u>  Termination of a member of the
> limited liability company shall occur by reason of: (i) the
> death, retirement, resignation, bankruptcy, or dissolution of a
> member, or (ii) redemption of the member's entire interest, or
> (iii) transfer of a member's entire interest; provided, however,
> that a member interest may only be transferred, whether in
> whole or in part, in compliance with, and subject to, the
> provisions of the Member Control Agreement.  The limited
> liability company shall not have the power to expel members.

Pursuant to section 4.1 of the Articles, "[u]nless dissolved earlier in accordance with law,

---

[1] Doc. 47.

3

the limited liability company shall dissolve on the date thirty (30) years following the date

these Article of Organization are filed with the Kansas Secretary of State."

The Operating Agreement, which all the parties agree was in effect when the

events at issue here commenced, is the Amended and Restated Operating Agreement

(hereafter "2006 Operating Agreement"), which became affective as of October 31, 2006.

The provisions of the 2006 Operating Agreement of interest in this case include the

provisions in articles 4 and 6 regarding management.  They provide as follows:

> 4.6  <u>No Management by Members.</u>  Except as otherwise provided in this Agreement, the Members shall not, under any circumstances, take part or interfere in any manner with the management of the Company and shall have no right or authority to act in such management capacity for or on behalf of the Company.  The issues specifically reserved to the Members are as follows:
>> . . . .
>> 4.6.4  Any other decisions specifically reserved to the Members in this Agreement, including but not limited to Section 6.1.2, the Articles or the Act.
>
> . . . .
>
> 6.1  <u>Management Committee.</u>  The business and affairs of the Company shall be managed by a Management Committee.  Subject to the terms and except as otherwise provided in this Agreement, the Members hereby delegate to the Management Committee the full power and authority to represent the Company and to manage the business of the Company.
>> . . . .
>> 6.1.2  The Management Committee may undertake such actions as are necessary to oversee the day to day business of the Company without meetings provided that the majority of the Managers consent to such action.  Action of the Management Committee outside of the ordinary course of business may occur only at a meeting held as required under this Section 6.1 or pursuant to written consent of the

4

Members as provided below.  For actions at a duly held meeting of the Members, the unanimous affirmative vote of the members shall be required.  Actions that require the unanimous consent of the Members include any decision to (1) remove a Manager; (2) borrow money and pledge assets of the Company, in an amount greater than $10,000; (3) file a petition for liquidation or reorganization under the United States Bankruptcy Code; (4) issue additional Units; (5) amend this Operating Agreement; . . . or (9) dissolve the Company.

The parties have stipulated that as of October 31, 2006, the three managers of Hayhook were Ran Smith, Oakleaf, and Cardonell, and the two members of Hayhook were Ran Smith, who owned 90 units of Hayhook, and SCI, which owned 10 units of Hayhook.

Also of importance are the definition of "Triggering Event" in article 1, and portions of article 9, "Dissolution and Termination," included in the 2006 Operating Agreement.  They provide:

"Triggering Event" shall be defined as (1) the dissolution, bankruptcy, insolvency of a Member, or (2) Disability or Retirement of a Member.
. . . .

9.1  <u>Events of Dissolution.</u>  The Company shall be dissolved upon the occurrence of any one of the following events:

9.1.1  The unanimous written agreement of all the Members; or

9.1.2  The occurrence of a Triggering Event or the occurrence of any other involuntary event which terminates the continued membership of a Member in the Company unless all of the Units of the Member causing the Triggering Event are purchased in accordance with ARTICLE 10 below; or

9.1.3  The sale of all or substantially all of the assets of the Company.

5

9.2 <u>Continuation of the Company</u>. Notwithstanding Section 9.1, the business of the Company may be continued on the terms and conditions of this Agreement on the occurrence of an event therein described, if the business of the Company is continued by the consent of Members (or the remaining Members upon the occurrence of an event described in Section 9.1.2) holding a majority of the Units owned by all Members within ninety (90) days after termination.

9.3 <u>Certificate of Cancellation</u>. As soon as possible following the occurrence of any of the events specified in Section 9.1, the Liquidating Member shall execute and file with the Kansas Secretary of State a Certificate of Cancellation in such form as shall be prescribed by the Act.

9.4 <u>Effect of Filing of Certificate of Cancellation</u>. Upon the filing of a Certificate of Cancellation with the Kansas Secretary of State, the Company shall cease to carry on its business, except insofar as may be necessary for winding up and liquidating its business.

Cardonell and Oakleaf, by a document dated March 25, 2010, gave notice of special meetings of the Management Committee of Hayhook and the Members of Hayhook to be held on April 5, 2010. A proposed resolution included with the notice made the finding that Ran Smith had taken unauthorized control of and mismanaged Hayhook, and provided for Cardonell, Oakleaf, and their spouses to take over control of Hayhook. Ran Smith objected to the conducting of the meeting on the grounds of improper notice and refused to participate. Nevertheless, the meetings were held, and the proposed resolutions were adopted.

On April 26, 2010, David R. Klassen, apparently as counsel for Ran Smith and Hayhook, in a letter to Martin Ufford, counsel for the Cardonells, Oakleafs, and SCI, took

6

the position that the actions of April 5, 2010, were null and void since they failed to recognize that SCI had been insolvent for some time and such insolvency automatically terminated SCI's membership in Hayhook, leaving Ran Smith as the sole and only legitimate member of Hayhook.

On May 1, 2010, Ran Smith held a special meeting of the sole remaining member of Hayhook. The actions taken included:

(a)     Ran, as the sole remaining member of Hayhook, consented to the continuation of all of the businesses of Hayhook, and authorized and directed all employees, agents and representatives of Hayhook to take all appropriate and necessary actions to continue such businesses.

(b)     The 2006 Operating Agreement was wholly amended and replaced by the Fully Amended Operating Agreement of Hayhook Cattle Company, LLC (herein referred to as the "2010 Operating Agreement").

(c)     The Limited Liability Company Articles of Organization of Hayhook Cattle Company, LLC, dated September 17, 2001, were wholly amended and replaced by the Fully Amended Articles of Organization of Hayhook Cattle Company, LLC, (herein referred to as the "Amended Articles").

(d)     Cardonell and Oakleaf were terminated as Managers and agents of Hayhook.

(e)     The actions of Cardonell and Oakleaf evidenced by the Minutes of Special Meeting of the Management Committee of Hayhook Cattle Company, LLC,

7

April 5, 2010, were withdrawn, set aside, and revoked.

On May 6, 2010, Ran Smith held a special meeting of the sole remaining Member of Hayhook at which the Amended Articles were corrected as requested by the Office of the Kansas Secretary of State, and on May 11, 2010, the Amended and Restated Articles of Organization of Hayhook Cattle Company, LLC (herein referred to as the "Amended Articles of May 6, 2010"), were filed at the Office of the Kansas Secretary of State. Pursuant to the Amended Articles of May 6, 2010, all matters not covered by them were to be controlled by the 2010 Operating Agreement.

The Amended Articles of May 6, 2010, and the 2010 Operating Agreement recite that Ran Smith is the only member of Hayhook. Pursuant to section 5.1 of the 2010 Operating Agreement, "[t]he Member has the sole right to manage and conduct the Company's business." Also pursuant to the 2010 Operating Agreement, section 5.2, "[t]he Member is an agent of the Company and has authority to bind the Company on all matters. The authority of the Member includes, without limitation, the authority to: . . . (f) commence a voluntary bankruptcy case for the Company." On July 19, 2010, Hayhook filed its voluntary petition for relief under Chapter 12 of the Bankruptcy Code. Ran Smith signed the petition as the "authorized individual."

**POSITIONS OF THE PARTIES.**

### A.  ARGUMENTS OF MOVANTS.[2]

---

[2] Docs. 51 and 58.

8

Movants argue that whether or not SCI was insolvent is irrelevant. They assert there is a conflict between the Articles and the 2006 Operating Agreement since "insolvency" is not included in the list of grounds for terminating a member in the Articles, but is included only in the 2006 Operating Agreement as a Triggering Event. They contend that the Articles control and mean that the alleged insolvency of SCI was not sufficient to terminate its membership. Therefore, the Movants submit that Ran Smith had no authority to remove Cardonell and Oakleaf as managers, to amend and restate the Articles and the 2006 Operating Agreement of Hayhook, or to file this Chapter 12 case.

### B. DEBTOR'S AND RAN SMITH'S ARGUMENTS.[3]

Debtor and Ran Smith assert that Ran Smith had proper authority to file this case. According to Debtor and Ran Smith, the 2006 Operating Agreement clearly provides that insolvency automatically terminates membership,[4] and this provision in the 2006 Operating Agreement is authorized by K.S.A. 17-7689. Upon SCI's becoming insolvent, its membership was terminated automatically without action by Ran Smith. After such termination, Ran Smith was the only member of Hayhook and had the authority to take the actions he did, including filing a petition for the company to seek relief under Chapter 12. In response to Movants' argument that the Articles control, making termination of

---

[3] Docs. 55, 60, and 64.

[4] When asserting that the removal was automatic upon SCI's insolvency, Debtor and Ran Smith rely upon K.S.A. 17-7689, which provides in part: "A person *ceases* to be a member of a limited liability company and *shall* become an assignee upon the happening of any of the following events: . . . ." (Emphasis added.) Neither the Movants nor CEB challenge this interpretation of the Act.

membership based upon insolvency ineffectual, Debtor and Ran Smith contend this construction is precluded by K.S.A. 17-7689 and 17-76,116.  According to Debtor and Ran Smith, the 2006 Operating Agreement controlled on May 1, 2010, and was properly applied by Ran Smith.

### C.  ARGUMENTS OF COLORADO EAST BANK AND TRUST (CEB).[5]

CEB, a secured creditor of the Debtor, supports the Motion to Dismiss.  In addition to the arguments relied upon by Movants, CEB asserts section 9.1.2 of the 2006 Operating Agreement does not say, as Debtor contends, that the occurrence of a Triggering Event automatically terminates the membership of a member.  Rather, according to CEB, pursuant to K.S.A. 17-76,112(e), a membership interest is not cancelled until redeemed.  Further, CEB argues that absent redemption of a member's interest following a triggering event, pursuant to section 9.2 of the 2006 Operating Agreement, the company continued to exist only for 90 days after the event, and, since Debtor relies upon a letter of January 11, 2010, as a basis for insolvency of SCI, the company had already dissolved before Ran Smith acted in May.

## ANALYSIS AND CONCLUSIONS OF LAW.

### A.  CONTROLLING LAW.

The Movants' Motion to Dismiss is premised upon the theory that Ran Smith did not have authority to place Hayhook into bankruptcy.  As the persons objecting to the

---

[5] Docs. 52 and 62.

filing, the Movants have the burden of proof.[6]  Whether a voluntary petition was properly

authorized is determined by applicable state law, as it is a matter not addressed by the

Bankruptcy Code.[7]  This case therefore presents issues of the law under the Kansas

Revised Limited Liability Company Act, K.S.A. 17-7662, *et seq.* (hereafter the "Act").

The current version became effective January 1, 2000, before the formation of Hayhook.

The Act is patterned after the Delaware Limited Liability Company Act.[8]  A Kansas

limited liability company is created by the filing of articles of organization with the

Kansas Secretary of State.[9]  An LLC is a separate legal entity and continues until

cancellation of the LLC's articles.[10]  Like the articles of a Kansas corporation, the

information required in the filed articles is minimal.  The private operating agreement

generally controls the affairs of the company.  It is the policy of the Act "to give the

maximum effect to the principle of freedom of contract and to the enforceability of

operating agreements."[11]  "Delaware courts regularly use standard contract law principles

to interpret LLC Agreements."[12]  In a dispute concerning control of the dissolution of a

---

[6] *In re S &S Liquor Mart, Inc.*, 52 B.R. 226, 228 (Bankr. D.R.I. 1985).

[7] *Price v. Gurney*, 324 U.S. 100, 106-07 (1945).

[8] Edwin W. Hecker, Jr., *The Kansas Revised Limited Liability Company Act*, 69 J. Kan. Bar Ass'n, 16, 16 (2000).

[9] K.S.A. 17-7673(b).

[10] *Id*.

[11] K.S.A. 17-76,134(b).

[12] Carter G. Bishop & Daniel S. Kleinberger, *Limited Liability Companies: Tax and Business Law*, ¶ 14.02[7][a] (2009).

11

deadlocked Kansas limited liability company, the Kansas Supreme Court applied the principles of contract construction to determine the intent of the parties as expressed in the operating agreement.[13]

A member is a person who has been admitted as a member of the LLC in accordance the Act.[14] "A person ceases to be a member of a limited liability company and shall become an assignee upon the happening" of specified events enumerated by the statute, such as making an assignment for the benefit of creditors or the filing of a petition in bankruptcy, unless otherwise stated in the operating agreement.[15] An assignee retains economic but no personal rights in the LLC.[16] Further, the Act provides that none of the specified events "that terminate the membership of a member will cause dissolution and winding up of the LLC unless the operating agreement so provides."[17] Rather, the Act provides an LLC is dissolved and its affairs shall be wound up upon the first to occur of enumerated events: The time specified in the operating agreement, if the LLC does not have perpetual existence; upon the happening of events specified in the operating agreement; unless otherwise provided in the operating agreement, upon the written consent of the members; at any time when there are no members; or the entry of a judicial

---

[13] *Investcorp, L.P., v. Simpson Investment Co., L.C.*, 267 Kan. 840, 983 P. 2d 265 (1999).

[14] K.S.A. 17-7663(l).

[15] K.S.A. 17-7689.

[16] Hecker, *The Kansas Revised Limited Liability Company Act*, 69 J. Kan. Bar Ass'n at 29.

[17] *Id*. at 28.

decree of dissolution.[18]  During the windup phase, an LLC remains a person with capacity

to seek relief under Title 11.[19]  Articles of organization are cancelled upon the dissolution

and winding up of the affairs of an LCC.[20]

**B.  ASSUMING THAT SCI BECAME INSOLVENT, ITS MEMBERSHIP IN HAYHOOK TERMINATED AND RAN SMITH BECAME THE SOLE MEMBER.**

The Movant's primary argument is that Ran Smith lacked authority to commence

this case on behalf of Hayhook since he was not the only member of Hayhook in May

2010, even assuming that SCI was insolvent in January 2010 and/or thereafter.  Hayhook

relies upon the inclusion of insolvency as a Triggering Event as defined by the 2006

Operating Agreement as the basis for termination of the membership of SCI, but Movants

contend that this definition conflicts with the Articles of Organization, those Articles

control over the Operating Agreement, and therefore SCI remained a member.

As stated above, the Act is based upon the freedom of contract.  Accordingly,

K.S.A. 17-7673 provides that the articles of organization filed with the Secretary of State

to form a limited liability company must include a very limited list of items and may also

include "any other matters the members determine to include therein."  The Hayhook

Articles therefore properly included the following:  "The provisions of the Operating

---

[18] K.S.A. 17-76,116.

[19] *See Lovell's Amer. Car Care v. Wells Fargo Bank, N.A. (In re Lovell's Amer. Car Care, LLC)*, Case no. WY-09-033 (10th Cir. BAP July 14, 2010), distinguishing *In re Midpoint Dev., LLC,* 466 F.3d 1201 (10th Cir. 2006).

[20] K.S.A. 17-7675.

13

Agreement shall be subordinate to the Articles of Organization." The Articles also provide in section 2.3: "Termination of a member of the limited liability company shall occur by reason of (i) the death, retirement, resignation, bankruptcy, or dissolution of a member." Movants contend this provision conflicts with and therefore controls over the provisions of the 2006 Operating Agreement on which Debtor relies, namely the definition of "Triggering Event" to include the insolvency of a member and the following definition of "Events of Dissolution": "The Company shall be dissolved upon the occurrence of any one of the following events: . . . 9.1.2 The occurrence of a Triggering Event or any other involuntary event which terminates the continued membership of a Member in the Company."

This argument requires the Court to determine whether, as a result of the provision in the Articles that the Operating Agreement is subordinate to the Articles, the Articles require the Court to construe the 2006 Operating Agreement definition of Triggering Event to exclude insolvency. The parties suggest and the Court agrees that rules of contract construction should be applied. The primary rule of contract construction is to ascertain the intent of the parties.[21] Under Kansas law, when two or more documents are executed by the parties at or near the same time concerning the same subject matter, they will be read and construed together.[22] "It is not within the province of a court to reform

---

[21] *Carrothers Const. Co., L.L.C., v. City of South Hutchinson*, 288 Kan. 743, 207 P.3d 231, 239 (2009).

[22] *City of Arkansas City v. Anderson*, 242 Kan. 875, 883, 752 P. 2d 673, 679 (1988).

14

an instrument by rejecting words of clear and definite meaning and substituting others.[23] Parties are presumed to contract with reference to existing statutes, which become part of the contract by implication.[24]

Applying the foregoing principles to the Articles and the 2006 Operating Agreement, without consideration of the clause relating to the priority of the Articles, the Court would construe the conditions for Termination of Membership stated in the Articles, which does not include insolvency, as being supplemented by the inclusion of insolvency in the definition of "Triggering Event" in the Operating Agreement. This construction would give effect to all the words used by the parties. Many matters not addressed in the Articles are included in the 2006 Operating Agreement. The Court finds no reason to conclude that the Articles were intended to enumerate all of the conditions for termination of membership, to the exclusion of the 2006 Operating Agreement's definition of "Triggering Event."

The Court finds that including consideration of the clause in the Articles relating to the priority of the Articles does not change this result. The Articles state: "The provisions of the Operating Agreement shall be subordinate to the Articles of Organization and the Member Control Agreement." The Member Control Agreement expands upon the meaning of this provision by stating: "Subject to the provisions of Kansas Statutes Annotated §76-7601, et seq., in the event of a *conflict* between the

---

[23] *Havens v. Safeway*, 235 Kan 226, 231, 678 P.2d 625, 629 (1984).

[24] *Steele v. Latimer*, 214 Kan. 329, 336, 521 P.2d 304, 310 (1974).

15

Articles of Organization or this Agreement, on the one hand, and the Operating

Agreement, on the other hand, the Articles of Organization or this Agreement, as the case

may be, shall be controlling."[25]  Thus, the Articles are controlling only in the event of

conflict.  Here the Court finds the apparent conflict between the Articles and the

Operating Agreement not sufficient to require elimination of insolvency as a Triggering

Event.  The relevant provision of the Articles addresses the Termination of Members and

does not expressly exclude insolvency.  The relevant provisions of the 2006 Operating

Agreement address the Triggering Event for purposes of defining the Events of

Dissolution and include insolvency.  The Court finds there is not a direct conflict since

the Articles do not prohibit what the 2006 Operating Agreement permits.  In addition, the

allegedly conflicting provisions of the two documents were drafted to address different

matters.  Both the Articles and the 2006 Operating Agreement can be given full effect

without causing a strained interpretation of the agreements.

Further, and of more importance, the expression of intent stated in the Member

Control Agreement is that the rule of construction in the Articles be subject to the Act.

K.S.A. 17-76,116(a) provides that a limited liability company is dissolved and its affairs

shall be wound up upon the first to occur of the date "specified in an *operating*

*agreement*" or "upon the happening of events specified in an *operating agreement*."  In

addition, K.S.A. 17-76,134(b) states, in part, that it is the policy of the Act "to give the

---

[25]Doc. 47-13, exhibit 83 (emphasis supplied).

maximum effect to the principle of freedom of contract and to the enforceability of *operating agreements*."  In other words, pursuant to the Act, it is the operating agreement, not the articles, which control dissolution.  If the Court were to hold that the rule of construction stated in the Articles had the effect of eliminating "insolvency" as a Triggering Event for dissolution, it would be ignoring the intent expressed in the Member Control Agreement that the rule of construction be subject to the Act, and would be eliminating a word from the Operating Agreement, contrary to the rules of contract construction.

The Court also rejects CEB's contention that SCI remained a member with particpatory rights even if SCI became insolvent because a membership interest is not cancelled until it is redeemed.  CEB relies upon K.S.A. 17-76,112(e) for this proposition. K.S.A. 17-76,112(e) provides:

> Unless otherwise provided in the operating agreement, a limited liability company may acquire, by purchase, redemption or otherwise, any limited liability company interest or other interest of a member or manager in the limited liability company.  Unless otherwise provided in the operating agreement, any such interest so acquired by the limited liability company shall be deemed canceled.

This statute is not applicable since there is no evidence that Hayhook acquired the interest of SCI.  Moreover, K.S.A. 17-7689 provides that a person whose membership ceases becomes an assignee, and K.S.A. 17-76,112(b)(3) provides that unless otherwise provided in the operating agreement, an assignee of a member's limited liability company interest has no right to participate in the management of the company.  The 2006

17

Operating Agreement, section 10.6, provides that a person admitted to the company as an assignee, but not as a member, shall not have any rights of a member under the Act or the Operating Agreement.

The Court therefore concludes that upon insolvency, SCI ceased to be a member of Hayhook, and Ran Smith became the sole member of Hayhook. In making this finding, the Court is not determining that SCI was insolvent at the time relevant to this case, as that issue is not before the Court.

**B. ASSUMING SCI CEASED TO BE A MEMBER OF HAYHOOK, HAYHOOK CONTINUED TO HAVE AUTHORITY TO CONDUCT ITS BUSINESS EVEN THOUGH AN AGREEMENT TO CONTINUE UNDER THE 2006 OPERATING AGREEMENT MAY NOT HAVE BEEN MADE WITHIN 90 DAYS OF THE "TRIGGERING EVENT."**

As set forth in the findings of fact, commencing on May 1, 2010, Ran Smith, as the sole remaining member of Hayhook, took numerous actions, including consenting to the continuation of the business of the company purusant to section 9.1.2 of the 2006 Operating Agreement, amending the Operating Agreement, amending the Articles, terminating Cardonell and Oakleaf as managers, withdrawing the actions of April 5, 2010, and filing the voluntary petition in this case. In addition to challenging these actions on the basis that SCI remained a member, which contention the Court has rejected for the reasons previously stated, CEB also challenges these actions on the basis of section 9.2 of the 2006 Operating Agreement. It provides:

> <u>Continuation of the Company.</u> Notwithstanding Section 9.1, the business of the Company may be continued on the terms and conditions of this Agreement on the

18

occurrence of an event therein described, if the business of the
Company is continued by the consent of Members (or the
remaining Members upon the occurrence of an event
described in Section 9.1.2) holding a majority of the Units
owned by all Members within ninety (90) days after
termination.

CEB takes the position that assuming the company was dissolved under section 9.1
because of the occurrence of a Triggering Event, Ran Smith's attempt to continue the
business of Hayhook was ineffective since it occurred on May 1, 2010, more than 90 days
after the January 11, 2010, letter on which he relies to evidence the insolvency of SCI.

First, the Court questions the factual basis for this argument. It is true that the
accountants' letter, included in the stipulated documents and which Debtor and Ran
Smith assert evidences SCI's insolvency, is dated January 11, 2010, but it sets forth
various alternatives, not all of which appear to have involved situations where SCI would
be insolvent. The minutes of the May 1, 2010, special meeting of the member of
Hayhook refer to the "recent correspondence from the accountants for Smith Cattle, Inc.
and income tax returns for Smith Cattle, Inc." as indicating insolvency, but include no
dates. Copies of the tax returns are not included in the stipulation. The date of the
alleged insolvency and the date of notice of the insolvency are not established, so those
seeking dismissal have failed to sustain their burden of proof on this argument.

Second, the Court is not convinced that action pursuant to section 9.2 of the 2006
Operating Agreement within 90 days of insolvency was required to continue the business
of Hayhook. The section refers to a period of 90 days after "termination," but termination

19

is not otherwise used in the section, except as a heading. The consequences of failing to continue the company pursuant to section 9.2 within 90 days are not stated in the 2006 Operating Agreement. Further, section 9.2 addresses continuation under the terms of the 2006 Operating Agreement, not continuation in general. K.S.A.17-76,116(b) provides that unless the operating agreement provides otherwise, the occurrence of an event causing the termination of a member does not cause the limited liability company to be dissolved or to be wound up. While section 9.1 of the 2006 Operating Agreement appears to state that the company is dissolved upon the occurrence of certain events, section 9.2 allows the continuation of the Company under the 2006 Operating Agreement by a majority vote of the members, section 9.3 provides for the filing of a Certificate of Cancellation as soon as possible following the occurrence of any of the events specified in section 9.1, and section 9.4 provides that the effect of filing the Certificate of Cancellation is that the company shall cease to carry on its business, except as necessary for winding up its affairs and liquidating its business.

These sections, construed together in light of Kansas law, lead to the conclusion that Hayhook could continue its business after an event of dissolution, even if no agreement to continue under the 2006 Operating Agreement was made within 90 days. It is the filing of a Certificate of Cancellation, not the occurrence of an event of dissolution, which would deprive Hayhook of authority to conduct its business. Hence, assuming that the May 1, 2010, special meeting of the member of Hayhook occurred more than 90 days after "termination," the sole member of Hayhook was not prohibited from continuation of

20

its business.

Third, whether the May 1, 2010, resolution to continue the business of Hayhook occurred within or after 90 days of the insolvency of SCI, the Court finds that such continuation was pursuant to the 2006 Operating Agreement. The minutes of the May 1, 2010, special meeting of the sole remaining member of Hayhook reflect that Ran Smith intended to continue the business under the existing operating agreement until the adoption of a restated agreement later at the same meeting. The resolution to continue the business was taken pursuant to section 9.2 of the 2006 Operating Agreement, and section 9.2 provides for the continuation of the business under the existing operating agreement by action within 90 days of "termination." Assuming that the resolution to continue the business was adopted more than 90 days after the "termination," the Court finds that the sole remaining member would have had authority to adopt an operating agreement for Hayhook, including the 2006 Operating Agreement. The Act contemplates that each LLC shall have an operating agreement. Because, as discussed above, an LLC continues after the termination of a member and an LLC shall have an operating agreement, the Court knows of no reason, and the parties have provided no reason, why the sole member of an LLC remaining after the termination of the membership of all other prior members could not adopt the operating agreement which was in effect prior to the termination. The Court therefore concludes that Ran Smith took appropriate action to authorize Hayhook to continue its business under the terms of the 2006 Operating Agreement.

**CONCLUSION.**

For the foregoing reasons, the Court finds that the objections of Movants and CEB to Hayhook's "authority to file this chapter 12 bankruptcy case"[26] lack merit. Therefore, assuming that SCI was insolvent at the relevant time, the Court finds that the filing of this case on behalf of Hayhook was properly authorized.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**IT IS SO ORDERED.**

**# # #**

---

[26] Doc. 47 at 3.